**STATE of Minnesota, Respondent,**

v.

**Eric Woods HALVORSON, Appellant.**

No. C2–92–2175.

Court of Appeals of Minnesota.

Sept. 21, 1993.

Michael F. Cromett, Asst. State Public Defender, St. Paul, for appellant.

Considered and decided by PETERSON, P.J., and NORTON and SCHUMACHER, JJ.

## OPINION

PETERSON, Judge.

On appeal from his convictions for kidnapping and second degree criminal sexual conduct, Eric Halvorson argues the evidence was insufficient to support his convictions, the trial court erred in denying his motion for a mistrial, and his 40–year sentence unfairly exaggerated the criminality of his conduct. We affirm Halvorson's convictions but agree his sentence was incorrect and reverse and remand for resentencing.

## FACTS

Appellant, Eric Halvorson, and the complainant, 19 year old N.C., were friends who often attended social events together as part of a group of friends. In March 1992, Halvorson asked N.C. and one of her friends to go to a dance with him the next night. Although both women initially agreed to go, the next evening N.C.'s friend changed her mind. N.C. decided to go anyway and left with Halvorson in his truck at 11:00 p.m.

After stopping at a bar for beer and a game of pool, N.C. and Halvorson went to a second bar where they had another beer and played another game of pool. About twenty minutes after they arrived, N.C. became sick and dizzy and went into the bathroom. At 1:45 a.m., Halvorson and a woman at the bar helped N.C. into Halvorson's truck. N.C. laid down on the seat as they drove away. Although N.C. felt dizzy and sick, she had consumed only two beers and did not believe she was intoxicated.

After Halvorson stopped the truck, N.C. sat up and saw they were outside a barn located next to Halvorson's house. Halvorson became angry and violent. He pulled N.C. out of the truck and into a milking pit in the barn. Halvorson used two ropes hanging from the ceiling to tie N.C.'s hands above her head. Halvorson lifted up N.C.'s clothes and

Hubert H. Humphrey III, Atty. Gen., Margaret H. Chutich, Asst. Atty. Gen., St. Paul, Bruce D. Obenland, Pope County Atty., Glenwood, for respondent.

touched her breasts, then tried to touch her vaginal area. When N.C. prevented Halvorson from touching her by keeping her legs and feet locked together, Halvorson got a two-inch-long bovine needle with a syringe and told her that she was going to hurt. Halvorson put the needle into the left side of N.C.'s right nipple and pushed it until it came out the other side of her breast.

Halvorson then tried to grab N.C.'s left breast but she pulled her knee up and covered herself. N.C. asked to leave and Halvorson said he would let her down if she would give him oral sex. When N.C. agreed, Halvorson let her down and cornered her against the wall. After N.C. screamed, Halvorson said, "Fine, we'll just go." Halvorson drove N.C. to her apartment and said he would let her out if she would forgive him. N.C. told Halvorson that she forgave him, then ran to her apartment.

At her apartment, N.C. told her fiance what had happened. Her fiance testified that at about 3:00 a.m., he saw N.C. get out of a truck and run to their apartment. He said N.C. was hysterical and she told him that Halvorson had pierced her breast and tied her up in a barn. N.C.'s fiance took her to the police station.

A doctor testified he examined N.C. the night of the assault and found a "puncture wound to the nipple and areola of the right breast" with some bruising and bruises around her wrists. The state introduced a picture of the injured breast taken a few days after the incident.

Halvorson gave an account of the early part of the evening that was similar to N.C.'s account, but testified that when he came out of a bar where he had stopped for beer, he saw N.C. sitting in the truck with her hand near her nose like she was doing drugs. Halvorson said that during their first game of pool, N.C. put her arm around his waist and called him sweetheart and darling. Halvorson also testified that when he laughed at a shot N.C. missed, she said, "Quit laughing or I'm going to rape you with this pool stick." Halvorson said he replied that he thought that was kinky and N.C. said "Yeah, I like kinky things." Halvorson testified that later, as the two drove to the second bar, N.C.

opened the glove compartment, found a bondage magazine and looked at it.

Halvorson agreed that N.C. spent most of the time at the second bar in the bathroom and that she was ill when they left. However, Halvorson said that about twenty minutes after they left, N.C. sat up and asked if there was any more beer. Halvorson said that while they shared the remaining can of beer, N.C. asked again about bondage and hinted that she wanted to try it so they decided to go to the milking barn.

Halvorson testified that, at the barn, N.C. said something about tying people up, so he tied her hands behind her back. Halvorson said he and N.C. decided to test the sensitivity of her nipple, so he got a bovine needle with a syringe. Halvorson said he just planned to prick N.C.'s breast when for some reason they both moved forward and he accidentally pushed the needle through her nipple. Halvorson said N.C. then got mad and wanted to leave so he untied her and took her home. Halvorson said that when he got home, he burned the twine and the needle.

At trial, two police officers testified N.C. gave them a statement on the night of the offense that was similar to her trial testimony. The officers stated they searched Halvorson's truck, house and barn. They found two ropes attached to pulleys hanging near the doors to the milking pit in Halvorson's barn, needles and syringes in a small room near the milking pit, and a jacket with blood stains in Halvorson's bedroom. The officers stated they did not find any pornographic magazines in Halvorson's truck. One officer testified Halvorson said he and N.C. had gone bar hopping and then he had taken her home.

Halvorson explained that when he was arrested, he did not tell the police what had happened because he was embarrassed and he did not know what N.C. had told her fiance. On cross-examination, Halvorson also admitted he told the police that if something had happened to N.C., her fiance probably was the one who had hurt her.

Near the end of Halvorson's direct testimony, when he said N.C. entered the barn voluntarily, N.C. yelled from the gallery:

You are a liar. Why don't don't [sic] you just tell the truth, you [expletive]. You hurt me, just like you hurt all of them (indicating). How can you sit there and lie? I didn't ask to be tied up and put a needle in my breast, you [expletive].

Defense counsel started to ask for a recess and also asked to approach the bench, but the trial court said to proceed. During the recess taken after Halvorson's direct testimony, defense counsel asked for a mistrial or a cautionary instruction. The trial court denied the motion for a mistrial on grounds that N.C.'s statements could have been made on rebuttal. The trial court agreed to give a cautionary instruction and told the jury to consider only testimony that came from witnesses on the witness stand.

On rebuttal, N.C. denied she used drugs, talked to Halvorson about bondage, or consented to anything that happened in the milking pit.

Halvorson was charged with two counts of second degree criminal sexual conduct and two counts of kidnapping. The jury found Halvorson guilty on all four charges. The jury also found that for sentencing purposes, N.C. had suffered great bodily harm during the kidnapping. Halvorson submitted to an evaluation and was found to be a patterned sex offender.

At the sentencing hearing, the trial court stated that one kidnapping charge and one criminal sexual conduct charge together constituted a single behavioral incident and sentenced Halvorson to a 20–year term for these offenses. Then, the trial court said that the other kidnapping and criminal sexual conduct charges constituted a second behavioral incident and sentenced Halvorson to a second consecutive 20–year term for these offenses. As grounds for departure, the trial court relied on N.C.'s particular vulnerability due to her illness and her consumption of alcohol provided by Halvorson; the particular cruelty with which the offenses were committed; Halvorson's prior felony convictions; and Halvorson's status as a patterned sex offender.

## ISSUES

I. Was the evidence sufficient to support Halvorson's convictions?

II. Was Halvorson denied a fair trial?

III. Did the trial court err in sentencing Halvorson?

## ANALYSIS

### I.

In reviewing a claim of insufficiency of the evidence, we are limited to carefully analyzing the record to determine whether the evidence was sufficient to permit the jury to find the defendant guilty of the offense charged. *State v. Webb*, 440 N.W.2d 426, 430 (Minn.1989). We cannot retry the facts, but must take the view of the evidence most favorable to the state and must assume the jury believed the state's witnesses and disbelieved any contradictory evidence. *State v. Moore*, 438 N.W.2d 101, 108 (Minn.1989). If the jury, giving due regard to the presumption of innocence and the state's burden of proving guilt beyond a reasonable doubt, reasonably could have found the defendant guilty, the verdict will not be reversed. *State v. Alton*, 432 N.W.2d 754, 756 (Minn. 1988).

■ Halvorson argues the evidence was insufficient to support his convictions because it was more consistent with his account of a consensual encounter. We disagree. While the parties' accounts of the early part of the evening could suggest their later activities were consensual, N.C.'s testimony that she did not go voluntarily with Halvorson into the milking pit or willingly participate in anything that happened there was sufficient on its own to support the convictions. *See* Minn.Stat. § 609.347, subd. 1 (1990) (sexual assault complainant's testimony need not be corroborated); *State v. Hill*, 285 Minn. 518, 518, 172 N.W.2d 406, 407 (1969) (uncorroborated testimony of single credible witness can be sufficient to support conviction).

■ Moreover, N.C.'s testimony was corroborated by (1) the consistent statements she gave to her fiance, the police, and the doctor immediately after the crime; (2) her behavior immediately after the offense; (3)

her prompt reporting of the crime; and (4) the nature of her injuries. *See State v. Garrett,* 479 N.W.2d 745, 747 (Minn.App.1992) (victim's testimony corroborated by prior consistent statements, prompt reporting, behavior after assault, and nature of injury), *pet. for rev. denied* (Minn. Mar. 19, 1992). Given N.C.'s testimony and the corroborating evidence, the evidence was sufficient to support the jury's decision to believe N.C.'s account of the evening rather than Halvorson's account.

## II.

Halvorson next argues N.C.'s outburst from the gallery deprived him of a fair trial. A defendant's constitutional right to a fair trial can be denied when a jury is exposed to potentially prejudicial material from an outside influence. *State v. Cox,* 322 N.W.2d 555, 558 (Minn.1982). However, if it can be shown beyond a reasonable doubt that the improper influence did not contribute to the verdict, then the error was harmless. *Id.* at 558; *see also McDonald v. State,* 351 N.W.2d 658, 659–60 (Minn.App.1984) (confrontation between defendant and potential state's witness), *pet. for rev. denied* (Minn. Oct. 16, 1984). To determine whether the error contributed to the verdict, we must consider the nature and source of the prejudicial statement, the number of jurors exposed to the statement, the weight of the evidence before the jury, and the probability that curative measures were effective in reducing the prejudice. *Cox,* 322 N.W.2d at 559.

Here, all of the jurors heard N.C.'s remarks. However, all of N.C.'s statements, except for the comment about others being hurt, could have been made and actually were made during rebuttal. The "hurting others" comment was too brief and too vague for the jury to have inferred from it that Halvorson had sexually assaulted other women. Finally, since the jury was instructed to evaluate N.C.'s credibility in light of Halvorson's claim that he was innocent, her status as the complainant carried no extra weight with the jury. *See Cox,* 322 N.W.2d at 559 (sheriff's remark was prejudicial because his position may have led jurors to believe he

was more competent to recognize guilty defendant than they were).

The weight of the evidence against Halvorson also was strong. N.C.'s testimony was corroborated by her prior consistent statements to others immediately after the assault, her prompt reporting of the offense, her injury, and her behavior after the assault. Conversely, Halvorson admitted he lied to the police twice by first telling them that nothing had happened between himself and N.C. and then by claiming N.C.'s fiance was responsible for any injury to N.C. Given these facts, it is doubtful that N.C.'s outburst affected the jury's evaluation of either party's credibility.

Finally, curative measures were taken to reduce any prejudice that did occur. Shortly after N.C.'s outburst, the trial court instructed the jury to disregard any statements that were not made on the witness stand. The court instructed the jury during the final charge to disregard any statement it had been instructed to disregard. The curative instructions, along with the weight of the evidence against Halvorson and the nature and source of the remark, show N.C.'s outburst did not affect the verdict and, therefore, did not deny Halvorson his right to a fair trial. *See McDonald,* 351 N.W.2d at 660 (cautionary instruction and weight of the evidence showed no prejudicial error in refusing to grant mistrial).

## III.

The decision to depart from the presumptive guidelines sentence rests within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion. *State v. Garcia,* 302 N.W.2d 643, 647 (Minn.1981).

Halvorson challenges his sentence on grounds that (1) his criminal history score was improperly calculated; (2) the kidnapping was assigned an incorrect severity level; (3) absent severe aggravating circumstances, he could not be sentenced to a term longer than twice the presumptive sentence; and (4) absent severe aggravating circumstances, the court could not impose both a durational

departure and a departure as to consecutive sentencing.

■ We agree the trial court erred in finding there were two behavioral incidents in this case, each consisting of a kidnapping and a sexual assault, and in imposing one sentence for each behavioral incident. However, the trial court properly could have imposed two sentences, one for kidnapping and one for criminal sexual conduct. *See* Minn. Stat. § 609.251 (1990) (conviction for kidnapping not bar to conviction of another crime committed during kidnapping). Accordingly, we reverse Halvorson's sentence but remand to allow the district court to impose a sentence for one kidnapping conviction and one criminal sexual conduct conviction. *See State v. Coe,* 411 N.W.2d 180, 182 (Minn.1987) (remand for resentencing appropriate provided defendant's total sentence on remand not greater than that originally imposed). Since the arguments Halvorson raises will be at issue on remand, we will address his claims in the interests of judicial economy. *See id.* at 181–82 and cases cited therein (following same procedure).

The starting point for determining the propriety of a sentence is to calculate the presumptive term for the offense using the defendant's criminal history score and the severity level of the offense.

### 1. *Criminal History Score.*

An offender's criminal history score is calculated by assigning points for prior convictions according to the severity level of the offense. Minn.Sent.Guidelines II.B.1.a. When an offender has been convicted of an offense that has been repealed but has had its elements incorporated into another offense, "the appropriate severity level shall be based on the current severity level ranking for the current felony offense containing those similar elements." Minn.Sent.Guidelines cmt. II.B.101.

Halvorson argues his criminal history score was calculated improperly because the court incorrectly determined elements of one of his prior convictions, aggravated assault in violation of Minn.Stat. § 609.225, subd. 1 (1974) (repealed 1979), had been incorporated

into first degree assault. We disagree. Minn.Stat. § 609.225, subd. 1 (1974) provided a person was guilty of aggravated assault if he assaulted someone and inflicted great bodily harm. Minn.Stat. § 609.221 (1990) provides a person commits first degree assault if he assaults someone and inflicts great bodily harm. Thus, the elements of Minn. Stat. § 609.225, subd. 1 (1974) have been incorporated into the current offense of first degree assault. First degree assault is a severity level VIII offense that is assigned two criminal history points under the guidelines. Minn.Sent. Guidelines II.B.1.a., V.

Halvorson maintains that as the complaint and the sentencing transcript show he did not inflict great bodily harm on the victim in 1975, his prior conviction was more like the current offense of second degree assault. However, the guidelines do not provide the severity level of a conviction for a repealed offense should be based on the behavior described in the complaint or at the sentencing hearing. Instead, the guidelines provide the severity level of a conviction for a repealed offense should be based on the current offense that incorporates the elements of the crime of conviction. Minn.Sent.Guidelines cmt. II.B.101.

■ The elements of aggravated assault have been incorporated into the current offense of first degree assault. Thus, the trial court properly based the severity level of Halvorson's conviction for aggravated assault on the severity level of first degree assault and correctly determined Halvorson's criminal history score was four.

### 2. *Severity level.*

■ Minn.Stat. § 609.25, subd. 2 (1990) provides that if a victim suffers great bodily harm during a kidnapping, the statutory maximum sentence for the offense increases from twenty to forty years. Great bodily harm is an injury that

creates a high probability of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ, or other serious bodily harm.

Minn.Stat. § 609.02, subd. 8 (1990). The trial court should instruct the jury to determine whether the victim suffered great bodily harm when the evidence suggests the possibility that this injury occurred. 10 *Minnesota Practice*, CRIMJIG 15.02 n. 3 (1990).

Halvorson argues the question of great bodily harm should not have been submitted to the jury because it was not supported by the evidence. We agree. At trial, the state presented evidence describing N.C.'s injury and pain immediately after the offense. No evidence was submitted showing the long-term effects of N.C.'s injury. Nothing in the record established N.C.'s injury created any probability of death or that she suffered permanent disfigurement or any permanent or protracted impairment of an organ or bodily function. The evidence in the record also failed to show N.C. suffered serious harm to the body. *See State v. Gerald*, 486 N.W.2d 799, 802 (Minn.App.1992) (two small cuts on neck and ear were not "other serious bodily injury" under Minn. Stat. § 609.02, subd. 8); *State v. Anderson*, 370 N.W.2d 703, 706 (Minn.App.1985) (liver laceration, head laceration requiring stitches, bruises, other head injury causing lapses into unconsciousness, and long scar constituted great bodily harm), *pet. for rev. denied* (Minn. Sept. 19, 1985). The trial court erred in submitting the question to the jury when the evidence presented at trial did not support this conclusion. Kidnapping without great bodily harm is a severity level VI offense.

### 3. *Presumptive sentence.*

The presumptive sentence for the sexual assault (level VII, criminal history score of four) is 88 (84–92) months and the presumptive sentence for the kidnapping (level VI and criminal history score of four) is 44 (42–46) months. Minn.Sent.Guidelines IV–V; *see* Minn.Sent.Guidelines cmt. II.B.102 (when multiple current convictions arise from single course of conduct and multiple sentences are imposed on same day pursuant to Minn.Stat. § 609.251, conviction for first offense sentenced should not be used to increase criminal history score for second offense sentenced).

### 4. Durational departure.

A trial court may impose an upward durational departure from the presumptive sentence if substantial and compelling aggravating circumstances are present. *State v. Best*, 449 N.W.2d 426, 427 (Minn. 1989). The length of an upward durational departure generally is limited to twice the maximum presumptive sentence. *State v. Glaraton*, 425 N.W.2d 831, 834 (Minn.1988); *State v. Evans*, 311 N.W.2d 481, 483 (Minn. 1981). When severe aggravating circumstances exist, the length of a sentence is limited only by the statutory maximum sentence for the offense. *Glaraton*, 425 N.W.2d at 834.

Here, the trial court cited four aggravating factors: (1) the victim's particular vulnerability due to Halvorson buying her liquor and her illness; (2) particular cruelty including threats, tying her with her feet off the floor, using unsterile needle, and not getting medical help; (3) Halvorson's three prior felony convictions less than fifteen years ago; and (4) Halvorson's status as a patterned sex offender. The state cites a fifth applicable aggravating factor: the current conviction is for a criminal sexual conduct offense involving victim injury and Halvorson has a prior criminal sexual conduct offense involving victim injury.

Halvorson argues the aggravating circumstances in this case were not severe enough to support a sentence longer than twice the presumptive term. However, one of the aggravating factors present in this case was Halvorson's status as a patterned sex offender. *See* Minn.Sent.Guidelines II.D.2.b.(7) (patterned sex offender status is an aggravating factor). - The patterned sex offender statute provides:

A court may sentence a person to a term of imprisonment of not less than double the presumptive sentence under the sentencing guidelines and not more than the statutory maximum * * * if:

(1) the court is imposing an executed sentence, based on a sentencing guidelines presumptive imprisonment sentence * * * on a person convicted of committing or

attempting to commit a violation of section 609.342, 609.343, 609.344, or 609.345 or on a person convicted of committing or attempting to commit any other crime listed in subdivision 2 if it reasonably appears to the court that the crime was motivated by the offender's sexual impulses or was part of a predatory pattern of behavior that had criminal sexual conduct as its goal;

(2) the court finds that the offender is a danger to public safety; and

(3) the court finds that the offender needs long-term treatment or supervision beyond the presumptive term of imprisonment and supervised release.

Minn.Stat. § 609.1352, subd. 1 (1990).

Halvorson does not dispute the finding that he is a patterned sex offender under the statute. Instead, Halvorson argues that the guidelines require that severe aggravating circumstances support any sentence that is longer than double the presumptive term including one imposed in reliance on the patterned sex offender statute. We have addressed this issue only once in an unpublished opinion. *See State v. Stirens*, No. C5–92–1893, unpub. op. at 5–6, 1992 WL 383425 (Minn.App. Dec. 29, 1992) (patterned sex offender status specifically identified in guidelines as aggravating factor that by itself may justify upward durational departure), *pet. for rev. granted* (Minn. Feb. 16, 1993).

The plain language of Minn.Stat. § 609.-1352, subd. 1 does not require severe aggravating circumstances to be present before a trial court may sentence an offender to a term longer than twice the presumptive sentence under the statute. *See* Minn.Stat. § 609.1352, subd. 1. Further, in interpreting the career offender statute,[1] the supreme court has said that a sentencing court could rely solely on the statute to depart durationally to impose the statutory maximum sentence for theft by swindle. *State v. Rachuy*, 502 N.W.2d 51, 52 (Minn.1993), *amended*

(Minn. July 9, 1993) (adding footnote to clarify that one-year sentence meant minimum felony sentence of one year and one day).

The *Rachuy* decision is persuasive in the present case because the provisions of the career offender statute are similar to those of the patterned sex offender statute. Both statutes allow a sentencing court to depart durationally to impose a sentence up to the statutory maximum term. *See* Minn.Stat. §§ 609.1352, subd. 1 (1990), 609.152, subd. 3 (1992). Accordingly, severe aggravating circumstances need not be present to justify the imposition of a sentence longer than double the presumptive term under the patterned sex offender statute.

5. Consecutive sentencing.

██ Halvorson also argues that when a sentence is imposed under the patterned sex offender statute, severe aggravating circumstances must be present before a sentencing court may depart both durationally and with respect to consecutive service. Here, the trial court departed durationally by sentencing Halvorson under the patterned sex offender statute. *See* Minn.Stat. § 609.1352, subd. 4 (1990) (sentencing under patterned sex offender statute is departure from guidelines). Halvorson maintains the trial court also departed from the guidelines by imposing consecutive sentences for offenses committed against the same victim during the same behavioral incident. *See* Minn.Sent.Guidelines II.F (except in listed circumstances, imposing consecutive sentences is a departure); Minn.Sent.Guidelines cmt. II.F.06 (guidelines intended to exclude consecutive sentencing when multiple offenses are committed against same victim during one behavioral incident); *State v. Notch*, 446 N.W.2d 383, 386 (Minn.1989).

The state relies on *State v. Swanson*, 498 N.W.2d 435 (Minn.1993) to argue consecutive sentences are permissive when a kidnapping

---

1. The career offender statute provides:

 Whenever a person is convicted of a felony, and the judge is imposing an executed sentence based on a sentencing guidelines presumptive imprisonment sentence, the judge may impose an aggravated durational departure from the presumptive sentence up to the

 statutory maximum sentence if the judge finds and specifies on the record that the offender has more than four prior felony convictions and that the present offense is a felony that was committed as part of a pattern of criminal conduct.

 Minn.Stat. § 609.152, subd. 3 (1992).

is one of the offenses sentenced. In *Swanson*, the supreme court stated Minn.Stat. § 609.251 "expressly permit[s] consecutive sentences to be imposed for multiple offenses committed against the same victim in a single behavioral incident where one of the offenses is kidnapping." *Id.* at 440.

Although *Swanson* held that consecutive sentences could be imposed for kidnapping and for another offense committed during the kidnapping, the supreme court did not clarify whether imposing consecutive sentences was a departure from the guidelines that had to be justified by aggravating circumstances.[2] *Id.* In the past, the supreme court has stated that when a defendant is sentenced for both a kidnapping and an offense committed during the kidnapping, the sentences are presumed concurrent. *State v. Crocker*, 409 N.W.2d 840, 845 (Minn.1987). In *Swanson*, the supreme court did not state that *Crocker* was overruled. Thus, although a trial court may impose consecutive sentences for a kidnapping and for an offense committed during the kidnapping, such a sentence is a departure from the guidelines that must be supported by aggravating circumstances.

As Halvorson argues, a trial court may not depart durationally and with respect to consecutive service unless severe aggravating circumstances are present that justify imposition of a term longer than double the presumptive sentence. *State v. Wellman*, 341 N.W.2d 561, 566 (Minn.1983). The patterned sex offender statute does not state that a trial court may not impose a sentence between twice the presumptive term and the statutory maximum by departing durationally and also depart with respect to consecutive service. Minn.Stat. § 609.1352, subd. 1. However, Minn.Stat. § 609.1352, subd. 1(1) states that before a sentence may be imposed under its provisions, the offender must have

been convicted of one violation of the listed statutes. The singular language in Minn. Stat. § 609.1352, subd. 1(1) suggests that sentencing for two convictions, which is necessary for imposition of consecutive terms, is not contemplated by the patterned sex offender statute.

Moreover, the supreme court recently reiterated the *Wellman* rule in interpreting the career offender statute. *Rachuy*, 502 N.W.2d at 52. In *Rachuy*, the supreme court concluded that while the sentencing court was free to depart either durationally or with respect to consecutive service, it could not do both in that case. *Id.*

Again, we find *Rachuy* persuasive. Even when status as a patterned sex offender is one of the aggravating circumstances present in a case, a trial court may not depart durationally and with respect to consecutive service unless severe aggravating circumstances are present that would justify imposition of a term longer than twice the presumptive sentence. On remand, the trial court should determine whether severe aggravating circumstances were present in this case before it exercises its discretion to decide whether to depart durationally and with respect to consecutive service. *See, e.g., Glaraton*, 425 N.W.2d at 834 (case involving severe aggravating circumstances); *State v. Hayes*, 456 N.W.2d 275, 277 (Minn.App.1990) (case involving severe aggravating circumstances), *pet. for rev. denied* (Minn. July 13, 1990).

**DECISION**

The evidence was sufficient to support Halvorson's convictions. The victim's outburst at trial was not prejudicial. Halvorson's status as a patterned sex offender by itself was sufficient to support imposition of a sentence longer than twice the presumptive term. The trial court could not depart durationally and with respect to consecutive ser-

---

**2.** The court referred to the standard of review for permissive consecutive sentences. *See Swanson,* 498 N.W.2d at 440 (reviewing court must determine whether consecutive sentences are commensurate with culpability and not exaggeration of criminality); *State v. Norris,* 428 N.W.2d 61, 70 (Minn.1988) (when consecutive sentences are permissive, court may impose them as long as they do not unfairly exaggerate criminality of

conduct). However, in *Swanson,* the court also listed the aggravating factors present in the case. *See Swanson,* 498 N.W.2d at 440 (defendant murdered, raped, and kidnapped victim, attempted to cover up crime, and lied to police). The court also noted that one of the sentences imposed in the case was for first degree murder which is excluded from the guidelines. *Id.*

vice unless severe aggravating circumstances were present in the case.

**Affirmed in part, reversed in part, and remanded.**